**COMARK COMMUNICATIONS,
INC., Plaintiff–Appellee,**

v.

**HARRIS CORPORATION,
Defendant–Appellant.**

No. 97–1537.

United States Court of Appeals,
Federal Circuit.

Sept. 9, 1998.

A. Lee Bentley, III, Hogan & Hartson L.L.P., Washington, D.C., argued for plaintiff-appellee. With him on the brief were David A. Kikel and David G. Leitch. Of counsel on the brief were G. Franklin Rothwell and Vincent M. DeLuca, Rothwell, Figg, Ernst & Kurz P.C., Washington, D.C.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, D.C., argued for defendant-appellant.

With him on the brief were J. Michael Jakes, and Scott A. Herbst. Of counsel on the brief were Douglas E. Whitney, Donald F. Parsons, Jr. and J. Andrew Huffman, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware.

Before NEWMAN, SCHALL, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

## DECISION

Harris Corporation (Harris) appeals the judgment of the United States District Court for the Eastern District of Pennsylvania, holding Harris liable for willfully infringing claims 1 and 14 of U.S. Patent No. 5,198,904 (the '904 patent) assigned to Comark Communications, Inc. (Comark). *See Comark Communications, Inc. v. Harris Corp.*, 47 USPQ2d 1469 (E.D.Pa.1998) (awarding costs and attorneys' fees); *Comark Communications, Inc. v. Harris Corp.*, No. 95–CV–2123, 1997 WL 431000 (E.D.Pa. July 17, 1997) (denying Harris's renewed motion for judgment as a matter of law (JMOL) and granting increased damages in light of the jury's finding of willfulness); *Comark Communications, Inc. v. Harris Corp.*, No. 95–CV–2123, 1997 WL 87260 (E.D.Pa. Feb. 24, 1997) (claim construction). Because the district court did not err in construing claim 1 of the '904 patent, and because substantial evidence supports the jury's findings of infringement and willfulness, we affirm the decision of the district court.

## BACKGROUND

Comark makes and sells ultra-high frequency (UHF) television transmission equipment. Conventional television signals contain two primary components: the video portion of the signal and the audio portion. In the early and mid–1980s, most high-power UHF television transmitters used separate hardware devices to amplify the video and audio signals for transmission. In the late 1980s, Comark developed an amplification system that operated in "common amplification" mode. Comark's common ampli-

fication mode allowed the video and audio signals to be combined before amplification and amplified together in the same amplification tube. By using the common amplification technique, the Comark system was able to reduce the amount of hardware required to perform the amplification, increase efficiency, and provide a built-in redundancy to those customers using a multi-tube system. The common amplification technique, however, suffered from cross-modulation problems that produced distortions known as H sync spurs that disrupted the audio portion of the signal.

The H sync spurs caused two problems. First, the primary H sync spur occurred at the frequency of 15.734 kHz that is used for transmission of the Broadcast Television System Committee stereo pilot, which indicates to television sets that the audio signal is being broadcast in stereo. As a result, this H sync spur sometimes caused false and intermittent triggering of the stereo processing circuitry in televisions tuned to the UHF signal. Second, the sum total of the H sync spurs could increase the overall modulation of the audio carrier to a level that exceeds regulatory limits.

Comark corrected the H sync spur problem with a circuit that uses a sample of the transmitter's video signal to "precorrect" the audio signal, thereby canceling the effects of cross-modulation. Comark filed a patent application for this invention on February 25, 1991 which issued as the '904 patent on March 30, 1993. The '904 patent is entitled "Aural Carrier Correction System and Method." In this appeal, only claims 1 and 14 are at issue. They read as follows:

1. An aural carrier correction system for a common amplification television transmitter which amplifies both an aural signal and a visual signal simultaneously, the transmitter including at least a IF vision modulator for receiving a video signal and for outputting the visual signal, the system comprising:

a video delay circuit for receiving and delaying the video signal to provide a delayed video signal;

a complimentary [sic] non-linear amplifier for receiving the delayed video sig-

nal and for separately and controllably generating a non-linear amplitude domain video signal and non-linear phase domain video signal; and

an amplitude and phase modulator for receiving the aural signal and for amplitude and phase modulating the aural signal using the non-linear amplitude domain video signal and the non-linear phase domain video signal, respectively, to generate a modified aural signal; and

an adder circuit for adding the modified aural signal to the visual signal outputted by the IF vision modulator to reduce unwanted noise appearing at specific frequencies in an output aural signal output from the transmitter.

14. A method for reducing unwanted aural carrier modulation caused by a video signal in a common amplification television transmitter which amplifies both an aural signal and a visual signal simultaneously, the method comprising the steps of:

mixing an aural carrier with an amplitude modulated video signal to generate a commonly amplified television transmission signal;

demodulating the commonly amplified television transmission signal to provide a demodulated aural signal;

performing a spectral analysis of the demodulated aural signal to determine the presence and frequency of unwanted aural signal noise resulting from unwanted aural carrier modulation;

generating a non-linear amplitude domain video signal and a non-linear phase domain video signal which respectively having amplitude and phase components that are directly opposite to unwanted amplitude and phase components added to the aural signal by the video signal;

amplitude and phase modulating the aural signal using the non-linear amplitude domain video signal and the non-linear phase domain video signal, respectively, to generate a modified aural signal; and

adding the modified aural signal to the visual signal in the transmitter.

The claimed correction circuit, represented by figure 1 from the '904 patent, is reproduced below:

*FIG. 1*

In the illustrated correction circuit, a video signal 25 is simultaneously inputted to both an IF vision modulator 19 and to a video delay circuit 13. The video signal travels simultaneously through these two separate paths before it is recombined by an adder 21 just prior to amplification. In the first path, the video signal 25 is inputted to an IF vision modulator 19 which converts the baseband video signal into an IF visual signal and outputs this signal to an adder 21. In the second path, the same video signal 25 is simultaneously fed into a video delay circuit 13 which delays the video signal and outputs it, first to a complementary non-linear amplifier 15, and then to an amplitude and phase modulator 17 which together "predistort" the aural signal to eliminate the problem of the H sync spurs. The modified aural signal is then outputted from the amplitude and phase modulator 17 to the adder 21. The signal output from the IF vision modulator 26 and the signal output from the amplitude and phase modulator 28 are combined by the adder 21 and then output to the remainder of the circuit for further processing and amplification.

In 1992, Harris, Comark's primary competitor in the UHF transmitter industry, began developing its own common amplification transmitter. Faced with the same H sync spur problem as Comark, Harris turned to Dennis Culling, an engineer based in Cambridge, England to design a correction circuit. Culling testified that he initially developed the Harris aural carrier correction circuit sometime during the week of February 8, 1993. On May 14, 1993, as it continued to develop and refine its precorrection circuit, Harris asked its patent attorney, Robert Sundheim, for an opinion on whether Harris's proposed design would infringe Comark's '904 patent. While Harris initially provided Sundheim with some information, the district court found that Harris directed Sundheim to obtain additional information not from Culling, the primary design engineer of the Harris circuit, but from David Danielsons, an engineer based in Quincy, Illinois. On July 7, 1993, Sundheim delivered to Harris's in-house patent counsel

a five-page opinion letter concluding that the Harris device did not infringe the '904 patent either literally or under the doctrine of equivalents. On May 23, 1995, the U.S. Patent and Trademark Office (PTO) issued U.S. Patent No. 5,418,578 (the '578 patent) assigned to Harris for Culling's correction circuit.

On April 11, 1995, Comark filed an action for patent infringement in the District Court for the Eastern District of Pennsylvania. In the complaint, Comark alleged that Harris infringed claims 1 and 14 of the '904 patent. Harris denied that it infringed the '904 patent and further asserted that the '904 patent was invalid. The trial took place before a jury between March 6, 1997 and April 17, 1997. The jury found that Harris had willfully infringed both claims 1 and 14 of the '904 patent under the doctrine of equivalents and rejected Harris's defense of invalidity. The jury awarded Comark $7.7 million in compensatory damages. In a Memorandum and Order dated July 17, 1997, pursuant to its authority under 35 U.S.C. §§ 284–285 (1994), the district court doubled the damages awarded by the jury to $15.4 million in light of the jury's finding of willfulness and also awarded attorney fees. The July 17, 1997 Memorandum and Order also denied both Harris's motion for a new trial and Harris's renewed motion for JMOL because the district court found that substantial evidence supported the jury's findings of both infringement and willfulness. Harris appeals to this court.

## DISCUSSION

### A. Claim Construction

■ Harris's first argument on appeal is that the district court erred in interpreting the limitation "video delay signal for receiving and delaying the video signal to provide a delayed video signal" of claim 1 to mean "a circuit that provides to the complementary non-linear amplifier a video signal that is delayed in time." Harris asserts that this definition ignores the teaching of the patent specification that the video delay circuit functions to compensate for delay introduced to the video signal by the IF vision modulator. Harris argues that as a result, no reasonable

jury could have found claim 1 of the '904 patent, properly construed, to be infringed, either literally or under the doctrine of equivalents.

■ We review the district court's claim construction *de novo*. *See Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (in banc). Proper claim construction requires an examination of the claim language, the written description, and, if relevant, the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996). The appropriate starting point, however, is always with the language of the asserted claim itself. *See id.; Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620, 34 USPQ2d 1816, 1819 (Fed.Cir. 1995).

Despite our repeated statements that limitations from the specification are not to be read into the claims, *see e.g.*, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433, 7 USPQ2d 1129, 1131 (Fed.Cir.1988), Harris nonetheless argues that the term "video delay circuit" should be read "in light of the specification" to include a limitation that the video delay circuit must also function to compensate for delay introduced to the video signal by the IF vision modulator. We have previously stated that "[w]hile ... claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581, 6 USPQ2d 2020, 2027 (Fed.Cir.1988); *see Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1563, 231 USPQ 833, 835 (Fed. Cir.1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."). We recognize that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification. *See, e.g.*, 1 Donald S. Chisum, *Chisum on Patents* § 3.02[1] & n. 12 (rel. Dec. 1996) ("The line between interpreting claim

language in light of the specification and reading a limitation from the specification into the claim is a fine one."). However, we believe that Harris advocates the latter rather than the former.

In this case, the term "video delay circuit" has a clear and well-defined meaning. This term is not so amorphous that one of skill in the art can only reconcile the claim language with the inventor's disclosure by recourse to the specification. *See E.I. du Pont de Nemours*, 849 F.2d at 1433 (stating that the specification can supply understanding of unclear terms, but should never trump the clear meaning of the claim terms). Rather than looking to the specification to ascertain the meaning of a claim term as it is used by the inventor in the context of the entirety of his invention, Harris instead asks us to look to the specification in order to limit the phrase "video delay circuit" to its functional purpose as disclosed in the preferred embodiment. Harris is indeed correct that the specification clearly discloses that the video delay circuit functions to compensate for delay introduced to the video signal being processed by the IF vision modulator by introducing a similar delay to the same video signal in the correction path. However, the language in the specification does not at all aid in our interpretation of the phrase "video delay circuit." It simply details how the video delay circuit is to be used in a single embodiment of the invention. It in no way sheds light on either the meaning of the term to the inventor, or the common meaning of the term to one of skill in the art.

Further, the language that Harris argues should limit claim 1 is clearly found in the '904 patent's description of the preferred embodiment. It is precisely against this type of claim construction that our prior case law counsels. "Appellant misinterprets the principle that claims are interpreted in the light of the specification. Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro–Devices, Inc.*, 848 F.2d 1560, 1571, 7 USPQ2d 1057, 1064 (Fed.Cir.1988) (internal

citation omitted); *see Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865, 9 USPQ2d 1289, 1299 (Fed.Cir.1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations.").

■ Finally, as the district court correctly pointed out, Harris's proposed construction of claim 1 would violate the doctrine of claim differentiation by rendering claim 2 superfluous. While we recognize that the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023, 4 USPQ2d 1283, 1288 (Fed.Cir.1987). Claim 2 incorporates claim 1 by reference and further defines the "video delay circuit" element with the following additional limitation: "wherein the video delay circuit provides a delay so that there is coincidence of the modified aural signal with the IF modulated signal at the adder circuit." To interpret the term "video delay circuit" to mean a video delay circuit that compensates for the delay introduced by the IF vision modulator, as Harris suggests, would render claim 2 completely superfluous and redundant of claim 1. Harris has not shown any reason sufficient to rebut the presumption that claim 1 should not be so limited in order to preserve the distinction between claims 1 and 2. Consequently, we decline Harris's invitation to limit the term "video delay circuit" to the specific function disclosed in the preferred embodiment and affirm the claim construction of the district court.

### B. Evidence Supporting the Jury Verdict of Infringement

#### 1. Claim 1

■ Harris next argues that, under the precedent set forth in *Malta v. Schulmerich*

*Carillons, Inc.,* 952 F.2d 1320, 1327, 21 USPQ2d 1161, 1166 (Fed.Cir.1991), *Lear Siegler, Inc. v. Sealy Mattress Co.,* 873 F.2d 1422, 1425–26, 10 USPQ2d 1767, 1770 (Fed. Cir.1989), and *Nestier Corp. v. Menasha Corp.,* 739 F.2d 1576, 1579, 222 USPQ 747, 749 (Fed.Cir.1984), the evidence of record is legally insufficient proof of infringement under the doctrine of equivalents to support the jury's finding. In particular, Harris asserts that Comark has failed to prove that the accused device contains an equivalent of the "video delay circuit" limitation of claim 1 through testimony explicitly comparing the function, way and result of the accused device with the claimed limitation. As a result, Harris argues that it is entitled to judgment of noninfringement as a matter of law. Because Harris's arguments on appeal have not properly addressed whether the jury's verdict under the doctrine of equivalents can be supported from the evidence in the record, Harris has not shown any error in the district court's decision to deny Harris's motion for JMOL on this issue.

■ Harris is indeed correct that our prior cases stand for the proposition that mere generalized testimony as to equivalence is insufficient as a matter of law to support a jury verdict finding infringement under the doctrine of equivalents. *See Texas Instruments, Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1567, 39 USPQ2d 1492, 1499 (Fed.Cir.1996) ("Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice [to show infringement under the doctrine of equivalents]."). We have also previously stated that "[t]he evidence and argument on the doctrine of equivalents cannot be merely subsumed in plaintiff's case of literal infringement." *Lear Siegler,* 873 F.2d at 1425. Rather, "a patentee must prove substantial identity as to each of the function, way and result prongs of the doctrine of

equivalents." *Malta,* 952 F.2d at 1327. The thrust of these cases is to ensure that a jury is provided with the proper evidentiary foundation from which it may permissibly conclude that a claim limitation has been met by an equivalent.

For its part, Comark argues that the "video delay circuit" element is but one of many disputed elements and that the jury may have found this element literally present, rather than by equivalents, and yet still have found claim 1 to be infringed under the doctrine of equivalents. *See Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423, 44 USPQ2d 1103, 1106 (Fed.Cir.1997) ("A device that does not literally infringe a claim may nonetheless infringe ... if every element is literally or equivalently present in the accused device."). In order to arrive at its verdict of infringement under the doctrine of equivalents, the jury must have found that one or more claim elements were met by equivalents, and could have found the remainder of the claim elements were met literally. The jury may well have found that all elements were met by equivalents rather than literally. Because no special verdict interrogatory was used to determine which elements were met literally and which were met equivalently, this court cannot presume to ascertain which elements the jury found to be met only by equivalents.[1] Thus, this court must uphold the jury verdict if there is sufficient evidence of equivalents and linking testimony such that a reasonable jury could have found that at least one element was met by equivalents. Despite the fact that Harris chose to concentrate its defense on the "video delay circuit" limitation, the jury was clearly instructed that each and every element of claim 1 must be present either literally or equivalently in order to find infringement under the doctrine of equivalents. We can find nothing in the record that limits the

---

1. We note that the use of special verdict interrogatories drawn to each claim element has been endorsed and indeed encouraged by the Supreme Court as "very useful in facilitating review, uniformity, and possibly postverdict judgments as a matter of law." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, —— n. 8, 117 S.Ct. 1040, 1053 n. 8, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1875 n. 8 (1997). While fourteen separate special verdict interrogatories were used in this case, the verdict form did not ask the jury to specifically state which claim elements were found literally and which were found by equivalents. Rather, the interrogatories merely asked whether or not each claim was infringed and under what theory (literally or by equivalents) the finding was supported.

scope of the jury's inquiry under the doctrine of equivalents to the "video delay circuit" limitation.[2] Thus, it is not necessary for us to find substantial evidence and linking testimony of equivalents with respect to the "video delay circuit" limitation. There is substantial evidence in the record from which the jury could well have found that limitation was met literally, rather than by equivalents. Harris admits in its reply brief that Comark put on evidence showing literal infringement and does not argue that the "video delay circuit" limitation could not be found literally by the jury on the evidence of record. Had Harris successfully shown that no reasonable jury could have found that the "video delay circuit" limitation was met literally, its argument that there is no substantial evidence to support a jury finding that this limitation was met by equivalents would be appropriate.[3] However, where there is no specific finding by the jury of equivalence as to a particular element, and the defendant has not successfully argued that a particular limitation could not be met literally, the defendant has assumed the burden of proving not only that there is insufficient evidence under *Lear Siegler* for a jury to find that the limitation could not be met equivalently, it must also establish that there is no substantial evidence in the record that would permit the jury to find that *any* limitation has been met by equivalents. In this case, Harris has not attempted to demonstrate that none of the remaining claim limitations at issue could not, on the evidence of record, be found by the jury to be met by equivalents. Because there is substantial evidence in the record from which a reasonable jury could find that the "video delay circuit" limitation could be met literally, and because Harris has not shown a failure of proof of equivalents on all of the remaining limitations at issue in the trial, we affirm the decision of the district court denying Harris's motion for JMOL on this issue.

### 2. Claim 14

■ Harris also argues that its setup and adjustment procedure[4] cannot infringe claim 14 under the doctrine of equivalents as a matter of law. Harris argues that the accused procedure performs a time domain analysis, rather than the spectral analysis[5] called for by claim 14. Harris essentially asserts that in light of the evidence of record, no reasonable jury could find that Harris's setup procedure infringes claim 14 under the doctrine of equivalents. This same argument was rejected by the district court in denying Harris's motion for JMOL. It is not the function of this court to reweigh the evidence presented to the jury. We may reverse a denial of a motion for JMOL only if the jury's factual findings are not supported by

---

**2.** In its instructions to the jury, the district court stated:

> Under the doctrine of equivalents, you may find that Harris' correction system infringes the Comark patent, even if it does not literally include all the elements of Claim 1. You may find infringement in such circumstances, if for each of the elements of Claim 1, that you find, are not literally present, there's a corresponding element in Harris' correction system that is equivalent to it.

Trial Transcript, day 20, page 40, II. 12–20 (April 15, 1997).

**3.** Harris argues that the notion that it should have appealed a finding on which it prevailed (literal infringement) makes no sense. Harris then asserts that this court must assess the evidence on literal infringement in the light most favorable to it concluding that the jury verdict may only be affirmed on sufficient evidence of equivalency. However, Harris's assumption that the "video delay circuit" limitation could not have been found literally is incorrect. While we are required to assume from the black box jury verdict that one limitation was not met literally, we are not required to assume that it was the "video delay circuit" limitation.

**4.** The '904 patent describes a seven-step setup and adjustment procedure by which the aural carrier correction system is initialized and adjusted essentially through trial and error to minimize the unwanted noise in the aural signal. This setup and adjustment procedure is claimed in claim 14 reproduced above.

**5.** Time domain analysis generally involves examining the variance of the amplitude of a signal as it varies with time, whereas spectral analysis generally involves an examination of the magnitude of the various frequency components for a given electrical signal. Based on the expert testimony at trial, as part of the court's claim construction, the district court defined spectral analysis as "a process for determining the components of a signal at specific frequencies or at a band of frequencies." *Comark*, 1997 WL 87260, at *7.

substantial evidence or if the legal conclusions drawn from the jury's findings cannot as a matter of law be supported by those findings. *See Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 47 USPQ2d 1225, 1233 (Fed.Cir.1998). Substantial evidence describes that minimum quantum of evidence from which a jury might reasonably afford relief. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The district court found, and we agree, that the testimony of Dr. Pickholz and Mr. Kiesel clearly provided substantial evidence from which the jury could find that the Harris procedure infringed claim 14 under the doctrine of equivalents.

As with claim 1, Harris argues that there is insufficient evidence of equivalence in the record under the *Lear Siegler, Malta,* and *Nestier* line of cases. Harris's argument on claim 14 suffers from the same fatal flaw it does with respect to claim 1. In the absence of a special jury interrogatory informing the court of how each element was met, there is no way of knowing which elements the jury found were met literally and which the jury found were met by equivalents.[6] As we stated above, this leaves a defendant challenging a district court's denial of its motion for JMOL on this basis with two options: 1) demonstrate why there is no substantial evidence from which a jury could find that a particular identified element is met literally, and then demonstrate the deficiency of the evidence on equivalents under the *Lear Siegler* line of cases with respect to that element; or 2) demonstrate why no element of the claim satisfies the *Lear Siegler* test. Harris has done neither. We therefore affirm the district court's denial of Harris's motion for JMOL on this issue for the same reasons stated in part B.1 of this opinion.

## C. Willfulness

■ Lastly, Harris challenges the jury's finding of willfulness as unsupported by substantial evidence. Whether infringement is willful is a question of fact, and must be established by clear and convincing evidence.

*See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 829, 23 USPQ2d 1426, 1437 (Fed.Cir.1992). This court therefore reviews a jury's finding of willful infringement to determine if there is substantial evidence to support that finding. *See Hoechst Celanese Corp. v. BP Chemicals Ltd.,* 78 F.3d 1575, 1583, 38 USPQ2d 1126, 1132 (Fed.Cir.1996). Harris's burden to show that "[n]o reasonable juror could find the asserted proof of willfulness rose to the quantum of clear and convincing evidence," *Read Corp.,* 970 F.2d at 829, is a heavy one. Harris bases its argument that no reasonable juror could have found clear and convincing evidence of willfulness almost exclusively upon the fact that Harris obtained a legal opinion from Sundheim that it did not infringe the '904 patent.

■ As a general matter, a potential infringer with actual notice of another's patent has an affirmative duty of care that usually requires the potential infringer to obtain competent legal advice before engaging in any activity that could infringe another's patent rights. *See Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1056, 32 USPQ2d 1017, 1023 (Fed.Cir.1994); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1579, 24 USPQ2d 1321, 1339 (Fed.Cir.1992). In determining whether willfulness has been shown, we look to the totality of the circumstances, understanding that willfulness, "as in life, is not an all-or-nothing trait, but one of degree. It recognizes that infringement may range from unknowing, or accidental, to deliberate, or reckless, disregard of the patentee's legal rights." *Rite–Hite Corp. v. Kelley Co., Inc.,* 819 F.2d 1120, 1125–26, 2 USPQ2d 1915, 1919 (Fed.Cir.1987). We must look at exculpatory evidence as well as evidence tending to show deliberate disregard of Comark's rights in determining whether substantial evidence supports the jury's verdict. The correct legal standard, therefore, is whether, in light of all the evidence, there is substantial evidence to support the jury's finding of willfulness by clear and convincing evidence.

---

6. The instructions given to the jury relating to the doctrine of equivalents with respect to claim 14 were identical to those given for claim 1. Trial Transcript, day 20, page 50, II. 3–5 (April 15, 1997); Trial Transcript, day 20, page 53, II. 4–10 (April 15, 1997).

It is well settled that an important factor in determining whether willful infringement has been shown is whether or not the infringer obtained the opinion of counsel. *See Ortho Pharmaceutical Corp. v. Smith,* 959 F.2d 936, 944, 22 USPQ2d 1119, 1126 (Fed.Cir.1992). However, the legal opinion must be "competent" or it is of little value in showing the good faith belief of the infringer. "Those cases where willful infringement is found despite the presence of an opinion of counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent." *Read Corp.,* 970 F.2d at 829. Thus, before we may consider the exculpatory value of an opinion of counsel, the legal advice contained therein must be found on the totality of the circumstances to be competent such that the client was reasonable in relying upon it. *See SRI International, Inc. v. Advanced Technology Laboratories,* 127 F.3d 1462, 1465, 44 USPQ2d 1422, 1424 (Fed.Cir.1997).

The reason a potential defendant obtains an opinion from counsel is to ensure that it acts with due diligence in avoiding activities which infringe the patent rights of others. Obtaining an objective opinion letter from counsel also provides the basis for a defense against willful infringement. In order to provide such a prophylactic defense, however, counsel's opinion must be premised upon the best information known to the defendant. Otherwise, the opinion is likely to be inaccurate and will be ineffective to indicate the defendant's good faith intent. Whenever material information is intentionally withheld, or the best information is intentionally not made available to counsel during the preparation of the opinion, the opinion can no longer serve its prophylactic purpose of negating a finding of willful infringement.

Comark does not challenge the legal competence of Sundheim's opinion, but rather challenges Harris's own actions in directing the creation of this opinion as undermining any reasonable good faith belief of competency. According to Comark, Sundheim's opinion cannot be relied upon by Harris because Harris intentionally withheld important information that Harris believed would result in an unfavorable opinion. In support of its argument, Comark points to two facts that it asserts permitted the jury to find willful infringement by clear and convincing evidence. First, Comark points to evidence that Harris management directed Sundheim to work with Danielsons instead of Culling, the designer of the Harris correction circuit, to obtain information necessary in preparing his opinion. Second, Comark points to evidence presented at trial that Sundheim's opinion with respect to claim 14 expressly restricts its analysis to a waveform monitor and not a spectrum analyzer. Comark also argues that the jury was entitled to find willfulness by clear and convincing evidence in light of evidence that, although at the time of Sundheim's opinion letter Harris's design did not employ a spectrum analyzer, Harris reverted to this design after Sundheim's opinion was complete and failed to seek a revised opinion from counsel. Comark argues that this evidence permits the inference that Harris intentionally withheld information from Sundheim that it knew would produce an unfavorable opinion and that the opinion was thereby rendered incompetent and unreliable by Harris's own actions.

In particular, Comark maintained at trial that Sundheim was not informed by Harris that the video delay circuit of claim 1 could be constructed using a modulator coupled with a detector, as is done in the Harris device. Comark produced evidence at trial that only a few months prior to Sundheim's opinion, Culling had combined a modulator and a detector to cause delay in an initial version of Harris's correction circuit. Comark argues that this information, in light of other evidence that in the relevant frequency range the modulator/detector combination circuit in the accused device has the same spectral characteristics as the claimed video delay circuit, would have undermined Sundheim's opinion which expressly distinguished the claimed invention from the Harris device based upon differing spectral characteristics. Comark points out that a reasonable jury could properly infer that Culling and this important information were "hidden" from Sundheim in order to secure a favorable opinion.

Comark also argues that Sundheim's opinion of noninfringement of claim 14 was expressly conditioned upon his assumption that the Harris circuit did not perform a spectral analysis of the demodulated aural signal because it employs a waveform monitor instead of a spectral analyzer. Comark introduced evidence at trial showing that the original design of the Harris circuit included a spectral analyzer, but that its use was dropped and the procedures were revised due to concerns that the design might infringe the Comark patent. Comark also introduced evidence that the use of the spectrum analyzer was reinstituted several months after Sundheim delivered his opinion to Harris management. Comark asserts that given Sundheim's statement that the Harris device did not infringe claim 14 because no spectrum analyzer was used, Harris's reliance upon Sundheim's original opinion was unreasonable and Harris should have informed Sundheim of the design change and sought a revised opinion. Comark argues that a reasonable jury could infer that Harris also willfully withheld this information from Sundheim in order to secure an opinion of noninfringement.

In its defense, Harris states that there are perfectly rational explanations for directing Sundheim to work with Danielsons and for failing to inform Sundheim of the use of a spectrum analyzer in its revised design. Harris argues that the district court erred in failing to consider testimony from Harris's engineers that the setup procedures were not changed to eliminate the spectrum analyzer due to concerns that it might infringe Comark's patent, but rather the changes were prompted merely by a good faith belief that doing so would minimize accusations of infringement. Harris asserts that the district court, in denying its renewed motion for JMOL, failed to consider this exculpating evidence and that when the evidence is considered on the whole, no reasonable juror could have concluded that Harris's reliance on Sundheim's opinion was ill-founded, and consequently that infringement was willful.

Harris misapprehends the role of the district court in deciding a motion for JMOL. A district court is not required to evaluate the evidence to determine whether the jury could have found otherwise. The district court is also not required to assume that the jury believed all or indeed any of Harris's exculpatory evidence in evaluating whether there was sufficient evidence to support the jury's finding. Simply because evidence is offered at trial does not mean that the court must assume the jury believed the evidence or gave it the same weight as does the profferor of such evidence.

 Harris argues that the reasons Sundheim was directed to work with Danielsons and not Culling in obtaining additional information on the Harris circuit was first, to avoid the six-hour time zone difference between the United States and England, and second, because Sundheim stated that he had difficulty understanding someone who did not speak "United States type of English." In light of Sundheim's testimony that he had never spoken to, or had even heard of Dennis Culling, the primary designer of the Harris circuit, before authoring his opinion of noninfringement, and evidence that Sundheim worked extensively with Culling in prosecuting the '578 patent several months later, the jury could well have found Sundheim's post hoc rationalization to be incredulous and self-serving. The same could also be said of Sundheim's assertion that the information that was not provided to him, and that would have been obtainable had he conferred with Culling, would not have changed his final opinion. Finally, Harris apparently argues that no reasonable juror could have disbelieved the testimony of Harris's engineers that they did not believe that the use of a spectrum analyzer in the setup procedures could infringe claim 14 of the '904 patent. This is plainly incorrect. It is not the province of an appellate court to second guess the jury's credibility determinations or to reevaluate the weight to be given the evidence. *See Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 183, 30 USPQ2d 1462, 1466 (Fed.Cir.1994) ("It is within the province of the jury to determine the credibility of a witness and the weight to be given his testimony; the jury is not required to accept testimony as true, even if it is uncontradicted."); *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1569, 24

USPQ2d 1401, 1410–11 (Fed.Cir.1992) ("Issues of credibility of witnesses are for the jury, and are not amenable to appellate review."). This court must, in light of all the evidence presented to the jury and reasonable inferences therefrom, determine whether there is substantial evidence from which the jury could find by clear and convincing evidence that Harris willfully infringed the '904 patent. We believe that the record discloses substantial evidence from which a reasonable jury could find, by clear and convincing evidence, that Harris willfully infringed Comark's '904 patent. We therefore affirm the district court's decision not to grant Harris's renewed motion for JMOL on this issue.

## CONCLUSION

The decision of the district court with respect to the issues of claim construction, infringement under the doctrine of equivalents and willfulness is hereby

*AFFIRMED.*