Leoutsakos v. Coll's Hospital Pharm.  CV-00-356-M   01/17/02
                UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW HAMPSHIRE


Thomas Leoutsakos,
      Plaintiff

      v.                              Civil No. 00-356-M
                                      Opinion No. 2002 DNH 015
Coll's Hospital Pharmacy, Inc.
and HealthCraft Products, Inc.,
      Defendants


                        **O R D E R**


     Thomas Leoutsakos ("Leoutsakos"), holds United States patent

5,400,450 (the "'450 patent"), covering a manual support

apparatus for assisting persons with impaired mobility when

getting into or out of bed.  He claims that Coll's Hospital

Pharmacy, Inc., and HealthCraft Products, Inc. ("defendants")

infringe that patent.  Defendants have counterclaimed, alleging

that Leoutsakos's patent is invalid for obviousness.  Before the

court are defendants' motion for summary judgment on Leoutsakos's

claim of patent infringement (document no. 11), to which

Leoutsakos objects, and Leoutsakos's motion to strike the

affidavits of John O'Brien and Steven Kot (document no. 17), to

which defendants object.  For the reasons given below,

Leoutsakos's motion to strike is denied and defendants' motion for summary judgment is granted.

## Motion to Strike

Leoutsakos moves the court to strike two affidavits submitted in support of defendants' motion for summary judgment, on grounds that the supplemental affidavit of John O'Brien contains objectionable hearsay and the affidavit of Stephen Kot is irrelevant in its entirety because Kot is a Canadian patent specialist who is unqualified to offer an expert opinion on a United States patent. Defendants counter that the O'Brien affidavit does not contain hearsay and the Kot affidavit is being offered not for its expert opinions but for its factual content. As for the O'Brien affidavit, the paragraphs cited by Leoutsakos contain no hearsay. As for the Kot affidavit, Kot's status as a Canadian patent attorney is insufficient to render him incompetent to offer the factual testimony contained in his affidavit. Accordingly, Leoutsakos's motion to strike the two affidavits is denied.

**Motion for Summary Judgment**

Defendants move for summary judgment on grounds that the allegedly infringing apparatus was designed specifically – and successfully – to avoid infringing the '450 patent. Leoutsakos does not assert that defendants' apparatus literally infringes his patent (Pl.'s Sur-Reply at 1), but argues that his theory of infringement, under the doctrine of equivalents, is sufficiently supported to survive summary judgment. The court does not agree.

I.   Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)).

> Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

In defending against a motion for summary judgment, "[t]he non-movant may not rely on allegations in its pleadings, but must set forth specific facts indicating a genuine issue for trial." Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001) (citing Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 174 (1st Cir. 1994)). When ruling upon a party's motion for summary judgment, the court must "scrutinize the summary judgment record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Navarro, 261 F.3d at 94 (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).

4

II.  Factual Background

The '450 patent was issued on March 28, 1995.  It discloses
"[a] manual support apparatus for use with a bed having a
mattress portion for providing a secure and stable method for a
user/patient to transfer into and out of bed independently, and
enhance in-bed mobility."  '450 patent (Def.'s Mot. Summ. J., Ex.
A) abstract, ll. 1-4.

Leoutsakos's initial patent application was rejected.
(Def.'s Mot. Summ. J, Ex. D (the prosecution history of the
Leoutsakos patent) at Bates stamp 207-11.)  The rejected
application contained three independent claims (numbers one,
eight, and ten) and eight dependent claims.  (Id. at Bates stamp
152.)  The patent ultimately issued differs in two ways from the
original application: claims seven through eleven were cancelled
(id. at Bates stamp 189-90, 214), and claim one was rewritten
(id. at Bates stamp 188, 214).[1]  The rewritten version of claim
one contains one new phrase suggested by the patent examiner (id.
at Bates stamp 208) and incorporates the subject matter from

---

[1] Claims two through six in the original application are
identical to claims two through six in the '450 patent as issued.
'450 patent, col. 6, ll. 27-47; Def.'s Mot. Summ. J., Ex. D at
Bates stamp 188-89, 214.

5

claim seven, which was, in the original application, dependent on claim one (id. at Bates stamp 189).

In Leoutsakos's original application, claim one read as follows:

> A manual support apparatus for use with a bed having a mattress portion, comprising:
> a planar plate member;
> a support tube having at least one leg;
> at least one tubular member having an internal bore for slidable receipt of said support tube leg; and
> means to attach said tubular member,
> wherein said plate member is placed under said mattress portion such that said tubular member is adjacent and substantially perpendicular to said mattress portion.

(Id. at Bates stamp 188.) That claim was rejected on three grounds: (1) indefiniteness, under 35 U.S.C. § 112, ¶ 2[2] (id. at Bates stamp 208); (2) obviousness, under 35 U.S.C. § 103[3] (id. at

---

[2] In explaining the rejection based upon indefiniteness, the patent examiner stated that "[i]f the phrase 'to said plate member' was inserted after 'member' in line 7 of claim 1, the above [indefiniteness] rejection would be overcome." (Def.'s Mot. Summ. J., Ex. D at Bates stamp 208.)

[3] In explaining the rejection based upon obviousness, the patent examiner stated:

> Claims 1 to 5 are rejected under 35 U.S.C. § 103 as being unpatentable over Yokohori [United States patent 4,561,549 (the "'549 patent")]. In the Yokohori

6

Bates stamp 209); and (3) "the judicially created doctrine of obviousness-type double patenting"[4] (id. at Bates stamp 210).

> device it is unclear exactly how the connection between the posts 4 and the standards 11 are made, however it should be noted the claimed coaxial tube and socket type connection is very common and closely resembles the connection used in Yokohori. Since the claimed connection is so very well known, it would have been obvious to one of ordinary skill in the art to use a socket and tube type connection in the Yokohori device. It should also be noted that the use of such a detachable connection has a well known advantage in that it allows for the knockdown of the structure to which it is applied, this is another reason for using a socket and tube connection in the Yokohori device.

(Def.'s Mot. Summ. J., Ex. D at Bates stamp 209-10.)

[4] In explaining the rejection based upon double patenting, the patent examiner stated:

> Claims 1 to 11 [are] rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1 to 10 of U.S. Patent No. 5,195,200 [held by Leoutsakos] in view of Yokohori. The '200 patent set forth basically all of the claimed subject matter with the exception of the planar plate member that can be slipped under a mattress. Yokohori teaches that it is known in the art to attach a support accessory to a bed by means of a planar plate 15 attached to the support device, the plate can be slipped under a mattress to retain the device in place upon a bed. The [sic] allows the device to be attached to the bed without the need for any tools or modification of the bedframe. It would have been obvious to one of ordinary skill in the art to use a planar metal plate that can be slid under a mattress as the retaining means of the device claimed in the '200 patent for the above reason.

7

In the '450 patent, claim one reads as follows:

> A manual support apparatus for use with a bed having a mattress portion, comprising:
> a planar plate member;
> a support tube having at least one leg;
> at least one <u>detachable</u> tubular member having an internal bore for slidable receipt of said support tube leg; and
> <u>detachable</u> means to attach said tubular member <u>to said plate member</u>,
> wherein said plate member is placed under said mattress portion such that said tubular member is adjacent and substantially perpendicular to said mattress portion.

'450 patent, col. 6, ll. 16-26 (emphasis added). The three phrases underlined above constitute the only differences between the rejected version of claim one and the claim as it appears in the '450 patent.[5] Leoutsakos currently manufactures and sells a manual support apparatus based upon the '450 patent.

_____

(Def.'s Mot. Summ. J., Ex. D at Bates stamp 210.)

[5] As for how and why these three alterations were made, "claim 1 has been amended as suggested by the Examiner [by adding the phrase 'to said plate member'], and by incorporating the subject matter of dependent claim 7, directed to the means to attach the tubular member to the plate member being detachable." (Def.'s Mot. Summ. J., Ex. D at Bates stamp 215.) Dependant claim seven, in the original application, was for: "The manual support apparatus of claim 1 wherein said means to attach said tubular member to said plate member is detachable." (<u>Id.</u> at Bates stamp 189.)

8

Based upon their understanding of the '450 patent and its prosecution history (O'Brien Supp. Aff. ¶¶ 6-9), defendants designed and now market their own manual support apparatus called the "Smart-Rail" (id. ¶ 5). Like the patented apparatus, the Smart-Rail is anchored by a member that slides under the mattress. But unlike the patented apparatus, the Smart-Rail's handle is not fixed; it may be locked in a position parallel to the long side of the mattress, but it may also be unlocked and swung outward, much like a gate, so that it stands perpendicular to the long side of the mattress. (O'Brien Supp. Aff. ¶ 5; Def.'s Mot. Summ. J., Exs. B & C.) Furthermore, the Smart-Rail uses: (1) a tubular support frame rather than a planar plate member to anchor the apparatus under the mattress (O'Brien Supp. Aff. ¶ 8.A; Def.'s Mot. Summ. J., Ex. C); (2) a tubular member that is fixed to the anchoring frame rather than a detachably attached tubular member (O'Brien Supp. Aff. ¶ 8.B; Def.'s Mot. Summ. J., Ex. C); (3) welding rather than a detachable means to attach the tubular member to the member that is slid under the mattress to anchor the apparatus (O'Brien Supp. Aff. ¶ 8.C; Def.'s Mot. Summ. J., Ex. E). Based upon these design differences, the Smart-Rail is: (1) more expensive to manufacture

9

than the patented apparatus, due to its tubular support frame –
rather than a planar plate member – for the anchoring portion of
the apparatus (O'Brien Supp. Aff. ¶ 9.A); and (2) more expensive
and cumbersome to ship and store than the patented apparatus, due
to the welding of the tubular member to the support structure,
which limits the ability of the Smart-Rail to be flattened for
shipping (id. ¶¶ 9.B-D).

III. Discussion

In their motion for summary judgment, defendants point out
that the Smart-Rail does not literally infringe upon the '450
patent, and they argue that it does not infringe under the
doctrine of equivalents.  As noted above, Leoutsakos seems to
concede that the Smart-Rail infringes, if at all, only under the
doctrine of equivalents.  According to defendants, the Smart-Rail
is not an infringing equivalent to the apparatus claimed in the
'450 patent because: (1) the Smart-Rail's tubular under-mattress
support frame is not the equivalent of a planar plate member; and
(2) the Smart-Rail's welded tubular member is not the equivalent
of a detachably attached tubular member.  Leoutsakos counters
that: (1) the Smart-Rail's tubular support frame is equivalent to

10

the planar plate member, based upon figures six, seven, and eight (sheet 4 of 10) of the '549 patent (Yokohori); (2) contrary to defendants' assertion, the Smart-Rail must have a detachable tubular member to accomplish its pivoting function; and (3) the Smart-Rail's tubular member, which is welded to the tubular support frame, is just as detachable as Leoutsakos's tubular member, based upon Leoutsakos's specification that the detachment of components that are welded together is equivalent to the detachment of components that are not welded together.  The court does not agree.

Under the United States Patent Act, "[e]xcept as otherwise provided . . . whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271(a) (Supp. 2001).

> An infringement analysis requires two steps: construction of the claims, to determine their scope and meaning, and comparison of the properly construed claims to the allegedly infringing device or method. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).  Claim construction . . . is a matter of law . . . . Lockheed Martin Corp. v.

Space Sys./Loral, Inc., 249 F.3d 1314, 1323 (Fed. Cir. 2001). The comparison of claims to the accused device or method, and the corresponding determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. Tanabe Seiyaku Co. v. United State Int'l Trade Comm'n, 109 F.3d 726, 731 (Fed. Cir. 1997).

J & M Corp. v . Harley-Davidson, Inc., 269 F.3d 1360, 1366 (Fed. Cir. 2001) (parallel citations omitted).


A.    Claim Construction

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (in banc), aff'd 517 U.S. 370 (1996)). When examining the intrinsic evidence, the court should first "look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." Vitronics, 90 F.3d at 1582 (citing Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995)). When doing so, the court must bear in mind the

"heavy presumption in favor of the ordinary meaning of claim language." Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1366 (Fed. Cir. 2000) (quoting Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999)). After considering the ordinary meaning of the claim language, the court should "review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning," Vitronics, 90 F.3d at 1582, but "any special definition given to a word must be clearly defined in the specification," Kraft Foods, 203 F.3d at 1266 (quoting Markman, 52 F.3d at 980). Finally, "the court may also consider the prosecution history of the patent, if in evidence." Vitronics, 90 F.3d at 1582 (citing Markman, 52 F.3d at 980; Graham v. John Deere Co., 383 U.S. 1 (1966)). However, while "the written description may aid in the proper construction of a claim term, limitations, examples, or embodiments appearing only there may not be read into the claim." Kraft Foods, 203 F.3d at 1366 (citing Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186-87 (Fed. Cir. 1998)).

13

Claim construction often entails a <u>Markman</u> hearing, the purpose of which is to provide the court with guidance on the interpretation of complex technical information. But where, as here, neither party has requested such a hearing, and the subject matter of the patent is not highly technical, the patent claims may be construed without benefit of a <u>Markman</u> hearing.

Claim one of the '450 patent is for a three-part apparatus consisting of: (1) an anchor (the "planar plate member"), '450 patent, col. 6, l. 16, to be placed under a mattress; (2) a handle (the "support tube having at least one leg"), <u>id.</u>, col. 6, l. 17, that is fixed in a position parallel to the long side of the bed and perpendicular to the plane of the anchor; and (3) a connecting piece (the "detachable tubular member" with "detachable means to attach said tubular member to said plate member"), <u>id.</u>, col. 6, ll. 18-22, into which the handle slides, and that is detachably attached to the anchor.

Claims two through six are all dependant on claim one. Claim two pertains to the anchor, and its construction from a rigid material, in a long, thin shape. '450 patent, col. 6, ll.

14

27-33. Claim three pertains to the handle and the connecting piece, which are to have "complementary cross-sectional configurations such that the support tube leg [the handle] is coaxially slidable through the bore of the tubular member [the connecting piece]." Id., col. 6, ll. 34-38. Claim four is for a version of the apparatus with two connecting pieces. Id., col. 6, ll. 39-41. Claim five is for a version of the apparatus in which the means to attach the connecting piece to the anchor is part of the anchor. Id., col. 6, ll. 42-44. Claim six is for a version of the apparatus in which the means for attaching the connecting piece to the anchor is part of the connecting piece. Id., col. 6, ll. 45-47.

In all of its embodiments, the patented apparatus consists of three pieces, with the handle sliding into the connecting piece, and the connecting piece detachably attached to the anchor. In the example given in the patent, which involves a u-shaped handle and two connecting pieces, '450 patent, col. 5, ll. 41-45, the connecting pieces are welded to two square tubes, referred to as "support braces," which are bolted to the anchor, id., col. 5, ll. 1-3. The bolting of the square tubes to the

15

anchor constitutes the detachable means of attaching the connecting piece to the anchor.

Based upon the ordinary meaning of the language of claim one, the patented apparatus has a detachable connecting piece that is detachably attached to the anchor. Moreover, the prosecution history of the '450 patent demonstrates the critical importance of detachable attachment of the connecting piece to the patented apparatus.

The two independent claims in the original application that were abandoned during the prosecution process were for: (1) a two-piece apparatus that claimed no connecting piece but only "means [presumably either detachable or non-detachable] to attach said support tube leg [the handle] to said plate member [the anchor]" (Def.'s Mot. Summ. J., Ex. D at Bates stamp 189 (claim eight)); and (2) a one-piece apparatus "wherein said planar plate portion [the anchor] and said support tube portion [the handle] are parts of a unitary construction" (id. at Bates stamp 190 (claim ten)). Thus, Leoutsakos abandoned an independent claim in which non-detachable attachment of the connecting piece to the

16

anchor was a possibility (claim eight) and an independent claim for an apparatus with a non-detachable attachment (claim ten).

In addition, the detachable attachment element, which was part of dependent claim seven in the original application, is now part of independent claim one. By amending his application in the way he did, Leoutsakos abandoned a pair of claims (one and seven), under which detachable attachment constituted one possible embodiment of the apparatus, in favor of a single independent claim (one), in which detachable attachment is a required element of the patented apparatus.

In other words, during patent prosecution, Leoutsakos abandoned his claims for any version of the apparatus in which the connecting piece is not detachably attached to the anchor. On that basis, the '450 patent must be construed as claiming a three-part apparatus consisting of a handle, an anchor, and a connecting piece, in any version of which the connecting piece is detachably attached to the anchor.

As for what constitutes detachable attachment, the detailed description of the invention discusses a means of attachment that involves attaching the connecting piece to a support brace (the square tube described above) which is "attached to plate 20 [the anchor] with screws, bolts, or the like." '450 patent, col. 2, ll. 54-55. The detailed description continues:

> Tubular members [connecting pieces] 22[6] are typically secured to support braces [the square tubes] 24 prior to being attached to planar plate [anchor] 20. Tubular members 22 may be secured to support braces 24 in any manner known to those skilled in the art, including being screw-fit, or snap-fit; preferably, however, tubular members 22 are welded to support braces 24.
>
> Support braces 24 typically includes [sic] holes 25 which align with holes 30 on planar plate 20. The holes 25, 30 <u>allow bolts, pins, clips, or any other suitable means</u> (not shown) to attach planar plate 20 to braces 24. In this manner, braces 24, including tubular members 22, may be removably attached from planar plate 20. Alternatively, braces 24 and tubular members 20 may be fixed (for example, welded) to either the top or underside of plate member 20. Another approach involves braces 24 and tubular members 22 being independently removably attached to plate member 20.

'450 patent, col. 3, ll. 40-57 (emphasis added). Based upon the foregoing, detachable attachment of the connecting piece may be

---

[6] The numbers in this passage refer to figure one (sheet 1 of 6) of the '450 patent.

18

achieved by bolts, pins, clips, or other similar means used to secure the connecting piece to the anchor. Furthermore, welding is described as an alternative, fixed means of attaching the connecting piece to the anchor.

At this point, the court must reject Leoutsakos's contention that "detachment from welding is equivalent to detachment without welding" (Pl.'s Mem. in Supp. of Obj. to Def.'s Mot. Summ. J. at 10). Rather than clearly stating a special definition for the term "detachable" that expands the ordinary concept of detachable attachment to include welding, see Kraft Foods, 203 F.3d at 1266 (citation omitted), the specification in the '450 patent itself plainly distinguishes between detachable attachment, such as would be accomplished through the use of bolts, pins, or clips, and fixed or permanent attachment, such as would be accomplished by welding. Furthermore, while the specification suggests that the connecting piece may be welded to the anchor, the language of the claim itself – which recites detachable attachment – controls. See Kraft Foods, 203 F.3d at 1366 (citation omitted) (explaining that while "the written description may aid in the proper construction of a claim term, limitations, examples, or

19

embodiments appearing only there [in the written description] may not be read into the claim.") In sum, the '450 patent does not contain a claim for a connecting piece that is welded to the anchor.

The court must reject, as well, Leoutsakos's contention that defendants' apparatus, the Smart-Rail, "must have a detachable tubular member in order to accomplish its pivoting function," (Pl.'s Mem. in Supp. of Obj. to Def.'s Mot. Summ. J. at 10). According to both the O'Brien supplemental affidavit (at ¶ 8.B) and Exhibit E to defendants' Motion for Summary Judgment, the Smart-Rail has a permanently welded connecting piece rather than one that is detachable. In response, Leoutsakos asserted nothing, under oath or otherwise, that would create a trialworthy issue of fact on this point. Rather, Leoutsakos submits only his counsel's bare allegation, which rests upon a misconception of the Smart-Rail.[7] Based upon the undisputed factual record, the

_____

[7] The Smart-Rail does not require a detachable tubular member to accomplish its pivoting function. Rather, while both tubular members are welded to the anchor, one vertical leg of the handle is attached to one of the tubular members in a manner that allows the leg to rotate in place while the other vertical leg swings, such that the handle may be either parallel to the bed, or perpendicular to it. The swinging leg of the handle is detachable from a second tubular member, but that tubular member

20

Smart-Rail does not employ a detachable tubular member that is detachably attached to the anchor.


## B.   Literal Infringement

As previously noted, Leoutsakos does not contend that defendants' apparatus literally infringes upon his patent.  If presented with that question, the court would concur that there is no literal infringement by the Smart-Rail.  "A claim is literally infringed when the accused device literally embodies each limitation of the claim."  Kraft Foods, 203 F.3d at 1370 (citing Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1217 (Fed. Cir. 1995)).  Here, the Smart-Rail does not literally infringe because the Smart-Rail does not embody the detachable attachment limitation of Leoutsakos's claim.


## C.   Infringement Under the Doctrine of Equivalents

According to Leoutsakos, the Smart-Rail nevertheless infringes his patent, under the doctrine of equivalents, because: (1) the Smart-Rail's tubular support frame for placement under a mattress is equivalent to the planar plate member claimed in the

– into which the swinging leg may be locked – is, like the first tubular member, permanently attached to the anchor by welding.

21

'450 patent, in view of the disclosure in the '549 patent (Yokohori); and (2) the Smart-Rail's welded connecting piece is equivalent to the detachably attached tubular member claimed in the '450 patent. Defendants counter that their tubular support frame cannot be an equivalent of Leoutsakos's planar plate member and that the Smart-Rail's welded connecting piece cannot be an equivalent of Leoutsakos's detachably attached tubular member, both on practical grounds and under the doctrine of prosecution history estoppel. The court agrees as to the non-equivalence of the two connecting pieces (one detachably attached, the other welded), and because that issue is dispositive, the court need not decide whether the two anchoring elements (the planar plate member and the tubular support frame) are equivalents.

"Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact," Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1341 (Fed. Cir. 2001) (citing Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998). However,

> the determination of infringement under the doctrine of equivalents may be limited as a matter of law. For example, the scope of equivalents may be limited by

22

prosecution history, if the applicant narrowed claims to overcome prior art.  See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 234 F.3d 558, 585 (Fed. Cir. 2000) (en banc) [cert. granted 121 S. Ct. 2519 (2001)]. . . .  Such limitations on the scope of equivalents are legal determinations . . . .

J & M Corp., 269 F.3d at 1366 (parallel citations omitted).

Moreover, "summary judgment of non-infringement can . . . be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims," Hilgraeve, 265 F.3d at 1341 (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir. 1999) see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 39 n.8 (1997) ("Where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obligated to grant partial or complete summary judgment") (citations omitted).

Infringement under the doctrine of equivalents occurs when "the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention."

Warner-Jenkinson, 520 U.S. at 40. "The determination of equivalence should be applied as an objective inquiry on an element-by-element basis." Id.

> Equivalence is shown by evidence that the accused device contains an element that is not "substantially different" from any claim element that is literally lacking [in the accused device], see [Warner-Jenkinson, 520 U.S. at 40], or that the claimed limitation and the accused component "perform[] substantially the same function in substantially the same way to achieve substantially the same result," see Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1321 (Fed. Cir. 1998).

Kraft Foods, 203 F.3d at 1372 (parallel citations omitted).

"Prosecution history estoppel is a legal limitation on the doctrine of equivalents." Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1377 (Fed. Cir. 2001) (citing Festo, 234 F.3d at 586.) "When a claim is narrowed for any reason related to the statutory requirements for a patent, prosecution history estoppel will arise with respect to the amended claim limitation and will bar an application of the doctrine of equivalents with respect to that claim limitation." Dethmers, 272 F.3d at 1377 (citing Festo, 234 F.3d at 563-64). Finally, while

24

> [p]rosecution history estoppel . . . [is] available as
> a defense to infringement, . . . if the patent holder
> demonstrates that an amendment required during
> prosecution had a purpose unrelated to patentability, a
> court must consider that purpose in order to decide
> whether an estoppel is precluded.  Where the patent
> holder is unable to establish such a purpose, a court
> should presume that the purpose behind the required
> amendment is such that prosecution history estoppel
> would apply.

Warner-Jenkinson, 520 U.S. at 40-41.


As a preliminary matter, there is no genuine issue as to the substantial dissimilarity between a detachably attached connecting piece and one that is welded to the anchor.  Welding, as a permanent means of attachment, is the very antithesis of detachability.  Furthermore, the plain language of the '450 patent specification distinguishes between two forms of attachment, detachable attachment such as bolts, pins, or clips, and fixed attachment, such as welding.  That distinction, clearly evidenced by the language of the patent itself, demonstrates that, even to Leoutsakos, welding is ordinarily regarded a fixed or permanent means of attachment while attachment via bolts, pins, or clips is understood to be a non-fixed or detachable means.  In a similar vein, the '450 patent specification does not

25

explicitly redefine the term "detachable attachment" to include welding, as would be required to establish such a novel conception of detachability. See Kraft Foods, 203 F.3d at 1266 (citations omitted). (It is certainly true that all sorts of tools (e.g., hacksaws, acetylene torches) might render an apparently permanent attachment "detachable," but that broad a construction of the term "detachable" requires a particularized definition in the patent itself.)

Thus, the court must reject Leoutsakos's current claims that welding is a form of detachable attachment contemplated by the '450 patent and that welding is an equivalent for bolts, pins, clips, or other forms of detachable attachment. All that Leoutsakos can point to in his attempt to stave off summary judgment is his bare assertion that welding is a detachable form of attachment, and that is simply insufficient to create a triable issue of material fact; no reasonable jury could find that welding is an equivalent for the detachable attachment claimed in the '450 patent. See Warner-Jenkinson, 520 U.S. at 39 n.8.

Furthermore, Leoutsakos's claim of infringement is barred by the doctrine of prosecution history estoppel. During the prosecution of the '450 patent, three grounds were given for rejecting claim one, as originally drafted: (1) indefiniteness; (2) obviousness; and (3) double patenting.[8] Leoutsakos remedied the indefiniteness objection by adding the phrase "to said plate member" to claim one, and remedied the double patenting objection by filing a terminal disclaimer (Def.'s Mot. Summ. J., Ex. D at Bates stamp 222). Aside from cancelling claims eight through eleven, the only other difference between the original application and the approved application was Leoutsakos's relocation of the detachable attachment element from dependant claim seven of the original application to independent claim one of the approved application. Therefore, the prosecution history demonstrates that claim one was narrowed, to exclude any means of attachment other than detachable attachment, for reasons related to patentability. Accordingly, the doctrine of prosecution history estoppel bars Leoutsakos from claiming non-detachable attachment, such as welding, as an equivalent of the detachable

---

[8] Claims eight through eleven were "rejected under 35 U.S.C. § 102(b) as being anticipated by Yohohori." (Def.'s Mot. Summ. J., Ex. D. at Bates stamp 208). Leoutsakos remedied this objection by cancelling claims eight through eleven.

27

attachment disclosed in the '450 patent.  See Dethmers, 272 F.3d at 1377 (citation omitted).  In other words, while Leoutsakos appears to criticize defendants for reviewing the '450 patent before designing the Smart-Rail (Pl.'s Obj. to Def.'s Mot. Summ. J. at 3), defendants were successful, as a matter of law, in their attempt to invent around the '450 patent, see WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1355 (Fed. Cir. 1999) ("the patent law encourages competitors to design or invent around existing patents") (citations omitted), because the Smart-Rail has neither a detachably attached connecting piece nor an element that is substantially similar, i.e., equivalent to, a detachably attached connecting piece.

## Conclusion

For the reasons given, Leoutsakos's motion to strike the affidavits of John O'Brien and Steven Kot (document no. 17) is denied, while defendant's motion for summary judgment on Leoutsakos's claim of patent infringement (document no. 11) is granted.  Furthermore, because defendants are entitled to prevail against Leoutsakos on Leoutsakos's infringement claim, defendants' counterclaim of patent invalidity is moot.

28

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 17, 2002

cc: George E. Kersey, Esq.
    Ralph F. Holmes, Esq.